## GIBBS et al. v. SOUTHERN CARBON CO. et al.*

### No. 5276.

Court of Appeal of Louisiana. Second Circuit.

Jan. 5, 1937.

Redmond & Thompson, of Monroe, for appellants.

Oliver & Digby, of Monroe, for appellees.

DREW, Judge.

Defendant Southern Carbon Company is the owner of a mineral lease granted in 1917 by Owen S. Gibbs, one of the plaintiffs, to 200 acres of land in Ouachita Parish. The pertinent royalty clauses were: "The royalties above mentioned

*Rehearing denied Feb. 5, 1937.

shall be (a) on oil * * * (b) on natural gas, at the rate of $200 per annum, payable quarterly, for each well producing gas exclusively, and from which gas is then being used or sold off the premises, it being understood that the lessor shall have the privilege, at the lessor's own risk and expense, of making connections and using gas from such wells free of charge for one dwelling on said land; (c) on gas produced from oil wells, when such gas is used or sold off the premises, at the rate of $10 per annum for each well while the gas is being so used or sold, and when such gas is used for the manufacture of gasoline there shall be an additional payment at the rate of $10.00 per annum for each well while such gas is being so used for the manufacture of gasoline."

On July 23, 1923, after production had begun, lessor requested an amendment of the contract in respect of the payment for royalty on gas and the lease was amended in the following respect:

"That said lease of date July 21, 1917, hereinabove referred to, be and the same is hereby amended and supplemented with reference to the payment of royalty for gas produced from said premises, so that from and after the date of this instrument the compensation and royalty to be paid by the lessee to the lessors for gas produced from said premises shall read in words and figures, as follows, to-wit:

"(b) Natural gas at the rate of $500 per annum payable quarterly for each well producing gas in paying quantity, but not producing oil in paying quantity, and from which gas is not being used or sold, but when and while such gas is being used or sold by lessee the same shall be metered and the lessor shall be paid a royalty of one-eighth at 3 cents per thousand cubic feet measured at 2-pound, pressure at the well, and the lessor shall have the privilege, at lessor's risk and expense of making connections and using gas from such well free of charge for one dwelling house on the land."

On said lease above described there were completed five natural gas wells numbered 1, 2, 3, 4, and 5. Well No. 1 was drilled in December, 1922; No. 2 in September, 1923; No. 3 in December, 1923; No. 4 in March, 1924; and No. 5 in 1924. The royalties fixed by said lease, as amended, were paid to plaintiff and accepted by him on all the wells until the year 1932, when well No. 4 ceased to produce. The re-

maining wells are still producing, and the royalties and rentals due from them have been paid to plaintiff and accepted by him. Nearly all the wells in this part of the Ouachita gas field make more or less salt water and all the wells are equipped with syphons, consisting of a tubing which is blocked at the bottom, with one joint of perforated pipe immediately above where it is blocked. This syphon goes to the bottom of the hole on the inside of the 4 or 4½ inch casing, and through it the water is blown off from time to time as it accumulates. The gas has pressure enough to lift the water through the small tubing, which is usually one inch, when often it is not strong enough to lift it through the larger casing. At times the syphon will become clogged and it would become necessary to clean it out and replace it, before it would function as intended.

In May, 1932, defendant learned that well No. 4 had ceased to produce. It sent its syphon crew out with instructions to pull the syphon and clean it out, if it needed to be cleaned. In an attempt to pull the syphon, it was pulled in two about four or five hundred feet from the top of the hole, which hole bottomed at 2,200 feet. This fact was reported to the foreman, who instructed the crew to cap the well and let it go, which they did. There was no other effort made to clean the well and, in February, 1933, defendant sent the Stovall Drilling Company to this well with instructions to pull the casing. Before the Drilling Company could rig up, the present suit was filed, in which plaintiff prayed for a temporary restraining order, a rule nisi, and for permanent injunction against defendant and the Stovall Drilling Company restraining either of them or their employees from pulling the casing. He coupled with his petition for injunction a claim for the payment of money under Clause (b), or $500 per well· clause of the amended contract; and upon clause (c), or $10 per year per well, for gas taken from an oil well under the original royalty paragraph.

On February 28, 1933, the day set for the hearing of the rule nisi, defendant made no appearance and a preliminary injunction was issued. On March 15, 1933, before issue was joined, plaintiff offered to file an amended petition in which he prayed that the defendant be ordered to account for the amount of money it had deducted as severance tax from the royal-

ties it had previously paid him, and that defendant be ordered to give a full accounting of all gasoline extracted from the gas taken from the five wells, and to pay to him one-eighth of the value thereof.

The amended petition was objected to by defendant and was not allowed by the lower court. On appeal here we remanded the case and ordered the amended petition allowed. 154 So. 380. After it was, defendant filed exceptions of no right and cause of action to said supplemental petition, which exceptions were sustained below and, no further evidence having been offered, the lower court reinstated its former opinion rejecting plaintiff's demands, recalling the preliminary injunction heretofore issued, and awarding defendant damages in the sum of $508, being the amount of damages actually sustained by defendant by the issuance of said writ of injunction. Plaintiff has appealed to this court.

■ The exceptions of no right and cause of action were properly sustained. Plaintiff was without right to claim the part of the severance tax deducted from his royalties. This question was settled in the case of Sartor v. United Carbon Company, 183 La. 287, 163 So. 103. In the original or amended lease, there is no provision for the payment of one-eighth of the value of the gasoline produced from the land. There is no contention that any oil was produced from this land, and none was; therefore no royalty is due from oil or gasoline or gas produced from oil wells. The royalty due plaintiff is clearly fixed in clause (b) of the amended lease. This clause is definite and unambiguous. Act No. 252 of 1924 defines "gas" as "natural gas," as it is taken from the earth, including any gasoline content it may have, but does not include casinghead gas. Therefore, when plaintiff and defendant agreed on a price for the natural gas as it came from the earth, it was intended that the lessee at that time become the owner of the gas and all its content which might be derived therefrom by refining or otherwise. The cases dealing with gas drawn from oil wells and saturated with oil or cases in which the royalty payments were based upon the value of the gas without any definite fixed price, in which instance the gasoline would be considered as giving an added value to the gas in arriving at its true value, have no application to the case at bar. Plaintiff, therefore, under his contract or lease, is without right

to recover for the gasoline extracted from the gas after same had left the well. The exception as to this part of the amended petition, is also good.

■ The claim made in the original petition, based upon the original lease for $10 per year per well for gasoline, is without merit, for the reason that the lease only provides for this payment when gas is taken from an oil well. There are no oil wells on the lease involved in this suit.

Other than the question of damages claimed by defendant, the only remaining questions are: Was well No. 4 a paying well at the time it was abandoned? And was defendant required to expend more money in an attempt to make it a paying well?

■ The record discloses that during the first three years after well No. 4 came in as a producer of gas, which was in 1924, its volume decreased from 9,500,000 cubic feet per day to 1,500,000 cubic feet, and that it continuously decreased each year thereafter until abandoned, in 1932. It decreased in volume much faster than the surrounding wells on the same lease. It is also shown by a preponderance of the testimony that this well never had as much salt water as the others and, in fact, the water gave little, if any, trouble in this well. It is certain that, at the time the well was declared by defendant to be "dead," it had ceased producing in paying quantities, without any fault of defendant, and it is not shown, and cannot be shown by any testimony, that it can ever be made to produce gas again in paying quantities. Defendant might spend many thousands of dollars in an attempt to revive this well, without success, and we know of no law which requires it to make large expenditures in an attempt to revive a well which it thinks and considers a dead one and one that has run its course as a paying producer. There is no evidence in the record to show that the well stopped producing because the syphon was clogged, thereby causing too much water to accumulate in the well. To the contrary, Fred Hill, who had charge of blowing the wells, testified that he blew this well almost every day for a while before it was finally abandoned; and up until the time it was abandoned, in an attempt to make it produce. When he was asked if it was reasonably possible that the well went dead because the syphon was choked up, he answered: "No, sir. It couldn't be that be-

590

cause I couldn't have blown the syphon if it had been stopped up. I said I blowed the well and syphon both. The syphon was not stopped up."

We know of no good reason to disregard this positive testimony, and it is not contradicted. It completely destroys plaintiff's theory that the syphon was clogged and the excess water caused thereby prevented the gas from coming from the well. The lower court found the well to be a "dead" one, and we are of the opinion the judgment in that respect is correct.

A different situation might prevail if by some act of defendant it had caused the well to cease to produce. That is not the case here. It is stipulated in the lease that defendant had the right to pull and remove the casing from the well or wells whenever they are abandoned because they fail to produce in paying quantities. Defendant was acting under this provision when it was enjoined by plaintiff.

Defendant was forced to pay the Stovall Drilling Company the expense it was put to in moving its rig onto this well site for the purpose of pulling the casing, and for removing same after the preliminary injunction issued. This amount is actual damage caused by the issuance of the preliminary injunction, and plaintiff is liable to defendant in that amount. The lower court awarded defendant judgment accordingly, and it is correct.

The judgment of the lower court is therefore affirmed, with costs.